Fuchsberg, J.
This appeal brings up for review the dismissal, at the end of the plaintiff’s case, of two causes of action, both of which arise out of the same somewhat unusual train of events. One is for false imprisonment and the other for negligence. The judgment of dismissal was affirmed by the Appellate Division by a vote of three to two. The issue before us, as to each count, is whether a prima facie case was made out. We believe it was.
Bearing in mind that, at the procedural point at which the case was decided, the plaintiff was entitled to the benefit of the most favorable inferences that were to be drawn from the record (Andersen v Bee Line, 1 NY2d 169, 172; 10 Carmody-Wait 2d, NY Prac, § 70:359, p 627 et seq.), we turn at once to the proof. In doing so, for the present we rely in the main on testimony plaintiff adduced from the defendant’s own employees, especially since plaintiff’s own recollection of the events was less than satisfactory.
Sometime after 9:00 p.m. on the evening of May 28, 1972, a date which occurred during the Memorial Day weekend, two police officers employed by the defendant City of Kingston responded in a radio patrol car to the rear of a commercial building in that city where they had been informed some *555 individuals were acting in a boisterous manner. Upon their arrival, they found three men, one Raymond Dugan, his brother Dixie Dugan and the plaintiff, Donald C. Parvi. According to the police, it was the Dugan brothers who alone were then engaged in a noisy quarrel. When the two uniformed officers informed the three they would have to move on or be locked up, Raymond Dugan ran away; Dixie Dugan chased after him unsuccessfully and then returned to the scene in a minute or two; Parvi, who the police testimony shows had been trying to calm the Dugans, remained where he was.
In the course of their examinations before trial, read into evidence by Parvi’s counsel, the officers described all three as exhibiting, in an unspecified manner, evidence that they "had been drinking” and showed "the effects of alcohol”. They went on to relate how, when Parvi and Dixie Dugan said they had no place to go, the officers ordered them into the police car and, pursuing a then prevailing police "standard operating procedure”, transported the two men outside the city limits to an abandoned golf course located in an unlit and isolated area known as Coleman Hill. Thereupon the officers drove off, leaving Parvi and Dugan to "dry out”. This was the first time Parvi had ever been there. En route they had asked to be left off at another place, but the police refused to do so.
No more than 350 feet from the spot where they were dropped off, one of the boundaries of the property adjoins the New York State Thruway. There were no intervening fences or barriers other than the low Thruway guardrail intended to keep vehicular traffic on the road. Before they left, it is undisputed that the police made no effort to learn whether Parvi was oriented to his whereabouts, to instruct him as to the route back to Kingston, where Parvi had then lived for 12 years, or to ascertain where he would go from there. From where the men were dropped, the "humming and buzzing” of fast-traveling, holiday-bound automobile traffic was clearly audible from the Thruway; in their befuddled state, which later left Parvi with very little memory of the events, the men lost little time in responding to its siren song. For, in an apparent effort to get back, by 10:00 p.m. Parvi and Dugan had wandered onto the Thruway, where they were struck by an automobile operated by one David R. Darling. Parvi was severely injured; Dugan was killed. (Parvi elected not to appeal from the dismissal of his cause of action against *556 Darling, who originally had been joined as an additional defendant.)
THE CAUSE OF ACTION FOR FALSE IMPRISONMENT
With these facts before us, we initially direct our attention to Parvi’s cause of action for false imprisonment. Only recently, we had occasion to set out the four elements of that tort in Broughton v State of New York (37 NY2d 451, 456), where we said that "the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged”.
Elements (1) and (3) present no problem here. When the plaintiff stated he had no place to go, he was faced with but one alternative—arrest. This was hardly the stuff of which consent is formed, especially in light of the fact that Parvi was, in a degree to be measured by the jury, then under the influence of alcohol. It is also of no small moment in this regard that the men’s request to be released at a place they designated was refused. Moreover, one of the policemen testified that his fellow officer alone selected the location to which Parvi was taken; indeed, this was a place to which the police had had prior occasion to bring others who were being "run out of town” because they evidenced signs of intoxication. Further, putting aside for the time being the question of whether such an arrest would have been privileged, it can hardly be contended that, in view of the direct and willful nature of their actions, there was no proof that the police officers intended to confine Parvi.
Element (2), consciousness of confinement, is a more subtle and more interesting subissue in this case. On that subject, we note that, while respected authorities have divided on whether awareness of confinement by one who has been falsely imprisoned should be a sine qua non for making out a case (Barker v Washburn, 200 NY 280; Robalina v Armstrong, 15 Barb 247; Herring v Boyle, 1 Cr M & R 377, 149 Eng Rep 1126; Meering v Grahame White Aviation Co., 122 L & T 44; see Halpern, Intentional Torts and the Restatement, 7 Buffalo L Rev 7; Prosser, False Imprisonment: Consciousness of Confinement, 55 Col L Rev 847), Broughton (supra, p 456) has laid that question to rest in this State. Its holding gives recognition to the fact that false imprisonment, as a dignitary tort, is not *557 suffered unless its victim knows of the dignitary invasion. Interestingly, the Restatement of Torts 2d (§ 42) too has taken the position that there is no liability for intentionally confining another unless the person physically restrained knows of the confinement or is harmed by it.
However, though correctly proceeding on that premise, the Appellate Division, in affirming the dismissal of the cause of action for false imprisonment, erroneously relied on the fact that Parvi, after having provided additional testimony in his own behalf on direct examination, had agreed on cross that he no longer had any recollection of his confinement. In so doing, that court failed to distinguish between a later recollection of consciousness and the existence of that consciousness at the time when the imprisonment itself took place. The latter, of course, is capable of being proved though one who suffers the consciousness can no longer personally describe it, whether by reason of lapse of memory, incompetency, death or other cause. Specifically, in this case, while it may well be that the alcohol Parvi had imbibed or the injuries he sustained, or both, had had the effect of wiping out his recollection of being in the police car against his will, that is a far cry from saying that he was not conscious of his confinement at the time when it was actually taking place. And, even if plaintiff’s sentient state at the time of his imprisonment was something less than total sobriety, that does not mean that he had no conscious sense of what was then happening to him. To the contrary, there is much in the record to support a finding that the plaintiff indeed was aware of his arrest at the time it took place. By way of illustration, the officers described Parvi’s responsiveness to their command that he get into the car, his colloquy while being driven to Coleman Hill and his request to be let off elsewhere. At the very least, then, it was for the jury, in the first instance, to weigh credibility, evaluate inconsistencies and determine whether the burden of proof had been met.
Passing on now to the fourth and final element, that of privilege or justification, preliminarily, and dispositively for the purpose of this appeal, it is to be noted that, since the alleged imprisonment here was without a warrant and therefore an extrajudicial act, the burden not only of proving, but of pleading legal justification was on the city, whose failure to have done so precluded it from introducing such evidence under its general denial (Broughton v State of New York, 37 *558 NY2d 451, 456, supra; Woodson v New York City Housing Auth., 10 NY2d 30).
Since the city nevertheless contends that as a matter of law a privilege to arrest was established in this case and since, as already indicated, in our view of the case there will have to be a new trial, raising the possibility of an amendment of the pleadings, we deem it appropriate to comment. The city’s argument runs that a police officer is not required to arrest for drunkeness but may exercise discretion to take an intoxicated person home or to some other safe place as the circumstances dictate and that that was what was done here.
In Sindle v New York City Tr. Auth. (33 NY2d 293), we reflected on the scope of the privileges which constitute justification. We there said (p 297), "[Generally, restraint or detention, reasonable under the circumstances and in time and manner, imposed for the purpose of preventing another from inflicting personal injuries or interfering with or damaging real or personal property in one’s lawful possession or custody is not unlawful”. Consequently, it may be that taking a person who is in a state of intoxication to a position of greater safety would constitute justification. But it is clearly not privileged to arrest such a person for the sole purpose of running him out of town, or, as further proof at the trial here established, once having arrested such a person, to follow a practice of running him out of town to avoid guardhouse chores for the police whenever there were no other prisoners in the local jail. Such acts cannot be sanctioned with the mantle of the privilege of justification. A person who has had too much to drink is not a chattel to be transported from one locus to another at the whim or convenience of police officers.
The Restatement of Torts 2d (§ 10, Comment d) states it well: "Where the privilege is based upon the value attached to the interest to be protected or advanced by its exercise, the privilege protects the actor from liability only if the acts are done for the purpose of protecting or advancing the interest in question. Such privileges are often called conditional, because the act is privileged only on condition that it is done for the purpose of protecting or advancing the particular interest. They are sometimes called 'defeasible’, to indicate the fact that the privilege is destroyed if the act is done for any purpose other than the protection or advancement of the interest in question.” It follows that, if the conduct of the officers indeed is found to have been motivated by the desire *559 to run the plaintiff out of town, the action for false imprisonment would not have been rebutted by the defense of legal justification. For, under plaintiffs theory, the false imprisonment count does not rest on the reasonableness of the police officers’ action, but on whether the unwilling confinement of the plaintiff was the result of an arrest for a nonjustified purpose.
THE CAUSE OF ACTION FOR NEGLIGENCE
The Appellate Division upheld the dismissal of the negligence cause on the ground that it was not reasonably foreseeable that a person who is under the influence of alcohol will walk approximately 350 feet in the dead of night and climb over a guardrail onto the New York Thruway. Before treating with that issue, we prefer to give our attention to the more fundamental question of the basic duty owed by the city to the plaintiff in this situation, a question somewhat obscured by the jargon of negligence terminology (Green, The Duty Problem in Negligence Cases, 28 Col L Rev 1014, 29 Col L Rev 255).
In that connection, we do not believe it aids our analysis of the negligence count to speculate on the duty of a police officer to arrest or not to arrest intoxicated persons. Instead, we confront directly the duty of police officers to persons under the influence of alcohol who are already in their custody, as was the case here once Parvi was compelled to enter the police car. The case law is clear that, even when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care (Marks v Nambil Realty Co., 245 NY 256, 258; Glanzer v Shepard, 233 NY 236, 239; Zelenko v Gimbel Bros., 158 Misc 904, affd 247 App Div 867). As Restatement of Torts 2d (§ 324) puts it, "One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor’s charge or (b) the actor’s discontinuing his aid or protection, if by so doing, he leaves the other in a worse position than when the actor took charge of him”.
Comment g to that section makes it evident that this duty cannot be fulfilled by placing the helpless person in a position of peril equal to that from which he was rescued. So it tells us *560 that "if the actor has succeeded in removing the other from a position of danger to one of safety, he cannot change his position for the worse by unreasonably putting him back into the same peril, or into a new one.”
We return now to the question of whether it was reasonably foreseeable that Parvi, who appeared sufficiently intoxicated for the police to take action, when set down in the dead of night in a lonely rural setting within 350 feet of a superhighway, whose traffic noises were sure to make its presence known, might wander onto the road. To state the question is to answer it. To be sure, much has to depend on what the jury finds to have been the state of his sobriety and the nature of the surrounding physical and other circumstances. But traditionally these are the kind of matters suitable for jury determination rather than for the direction of a verdict (Prosser, Torts [4th ed], § 45, p 290; cf. Sheehan v City of New York, 40 NY2d 496, 502).
Finally, a word of clarification may be in order as to the legal role of plaintiiFs voluntary intoxication. To accept the defendant’s argument, that the intoxication was itself the proximate cause of Parvi’s injury as a matter of law, would be to negate the very duty imposed on the police officers when they took Parvi and Dugan into custody. It would be to march up the hill only to march down again. The clear duty imposed on the officers interdicts such a result if, as the jury may find, their conduct was unreasonable (Fagan v Atlantic Coast Line R. R. Co., 220 NY 301, 307; Black v New York, New Haven & Hartford R. R. Co., 193 Mass 448; see Restatement, Torts 2d, § 324, Illustration 3). For it is the very fact of plaintiff’s drunkeness which precipitated the duty once the officers made the decision to act.
Accordingly, the order of the Appellate Division should be reversed, both causes of action reinstated and a new trial ordered, with leave to the defendant, if so advised, to move at Trial Term for leave to amend its answer to affirmatively plead a defense of justification to the cause of action for false imprisonment.